# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **E.L. HAYNES PUBLIC CHARTER SCHOOL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-1472 (RMC) |
| | ) | |
| **CHAUN FROST,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

E.L. Haynes Public Charter School (E.L. Haynes) seeks judicial review of a Hearing Officer's Determination and Order (HOD) rendered in favor of Chaun Frost, the parent and next friend of A.T., a minor,[1] following an administrative due process hearing under the Individuals with Disabilities Education Improvement Act of 2004 (IDEA), 20 U.S.C. §§ 1400 *et seq.* E.L. Haynes challenges the factual and legal conclusions of the HOD and the Order that E.L. Haynes find A.T. in need of special education and provide her with various remedies. Ms. Frost supports the Hearing Officer's Decision in whole. The parties have filed cross-motions for summary judgment. The Court has considered the administrative record and the parties' briefs carefully and concludes that the Hearing Officer's Decision must be reversed in part. Therefore, the Court will grant in part and deny in part the motions for summary judgment.

---

[1] The minor shall be referred to as A.T., pursuant to LCvR 5.4(f)(2) and Fed. R. Civ. P. 5.2(a).

## I. FACTS

A.T. is a fifteen-year-old student who was enrolled at E.L. Haynes for the 2011-2012 (seventh grade), 2012-2013 (eighth grade), and 2013-2014 (ninth grade) school years. Administrative Record (AR)[2] at 826. At the end of her seventh grade year, in 2012, A.T. was admitted to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for weight loss due to morbid obesity and weight management on June 14, 2012. The medical director at ▮▮▮▮▮ diagnosed A.T. with morbid obesity and intermittent explosive disorder. *Id.* at 148. A.T. received individual, group, and family therapy at ▮▮▮▮▮. *Id.* at 133-34.

A.T. worked on an 8th grade curriculum while at ▮▮▮▮▮ *Id.* at 136-37. At the time of her discharge, ▮▮▮▮▮ summarized A.T.'s academic work as follows:

> [A.T.] worked consistently on her academic coursework from E.L. Haynes Middle School. She worked well on academic assignments and enjoyed participating on special projects. [A.T.] also completed supplemental assignments when she had completed her assigned work. At times she displayed role model behaviors in class and asked for assistance when clarification was necessary. [A.T.] had a good work ethic and enjoyed working on challenging word puzzles when her coursework was completed.

*Id.* at 136. Her "attitude towards school improved over time" and she "worked on reducing incidences of rude and inappropriate comments during instructional time." *Id.*

Although A.T. experienced a reduction in anxiety over the course of her stay at ▮▮▮▮▮ she "remain[ed] somewhat anxious and [was] prone to experiencing stress-related somatic symptoms" and had "moderately high reactive anger and moderately low anger control"

---

[2] The Administrative Record was filed in eight parts: Part 1 [Dkt. 19-1] includes pages 1-100; Part 2 [Dkt. 19-2] includes pages 101-200; Part 3 [Dkt. 19-3] includes pages 201-400; Part 4 [Dkt. 19-4] includes pages 401-600; Part 5 [Dkt. 19-5] includes pages 601-800; Part 6 [Dkt. 19-6] includes pages 801-850; Part 7 [Dkt. 19-7] includes pages 851-1041; Part 8 [Dkt. 19-8] includes pages 1042-1311.

when she was discharged on October 18, 2012. *Id.* at 134-35, 524, 527. ████ reported

that A.T. "made progress in appropriate social skills. She does continue to exhibit rude and

disrespectful behavior to peers and staff, but is easily redirected." *Id.* at 138. A.T. "has learned

what stress is and how it impacts her on physical, emotional and behavioral levels. . . . A.T. has

learned over 3 relaxation, visualization, breathing techniques and basic meditation and yoga

techniques." *Id.* at 136. ████ identified A.T.'s prognosis as "guarded" and noted that she

"will continue to require individual therapy, family therapy, and nutritional counseling." *Id.* at

135, 139. As a result of her stay at ████, A.T. missed the first 43 days of the 2012-2013

school year. *Id.* at 774. She returned to E.L. Haynes on October 22, 2012. *Id.*

In August 2012, while A.T. was a ████, her mother asked that A.T. be

evaluated for special education and signed a consent form for that purpose. Shortly after A.T.

returned to E.L. Haynes, the school's psychologist Cassandra Class completed a confidential

psycho-educational evaluation of A.T. on November 5, 2012 (Psych/Ed Evaluation). *Id.* at 147-

160.

A multi-disciplinary team (MDT) convened on November 8, 2012 to consider the

Psych/Ed Evaluation and determine whether A.T. was eligible for special education. *Id.* at 567.

Members of the multi-disciplinary team included Plaintiff Chaun Frost, A.T.'s mother; Cheryl

Frost, A.T.'s grandmother; Julie Holt, Inclusion Coordinator; Rabiah Harris, A.T.'s general

education teacher; Beth Barnes, A.T.'s 8th grade inclusion teacher; Cassandra Class; and Teri

Johnson-Stokes, School Social Worker. *Id.* at 566. The team reviewed information from a

variety of sources, including the results of an earlier 2009 psychological evaluation, which

showed that A.T. scored in the average range for academic and cognitive skills. *Id.* at 555-59;

567-68. The team discussed Ms. Class' Psych/Ed Evaluation, including her cognitive

assessments, achievements tests, the Behavior Assessment System for Children, Second Edition

(BASC-II), and a summary of A.T.'s health history. *Id.*

As summarized in the Psych/Ed Evaluation, A.T.'s medical history showed that

A.T. took medication for diabetes, ADHD, asthma, and gastrointestinal problems and had been

diagnosed with ADHD, oppositional defiance disorder, enuresis, morbid obesity, and intermittent

explosive disorder. *Id.* at 148, 158. She had been admitted to the Psychiatric Institute of

Washington in March and May of 2012 for emotional issues. *Id.* at 148. The Psych/Ed

Evaluation noted that A.T. participated in weekly outpatient therapy and was under the care of a

psychiatrist. *Id.* at 158.

The Psych/Ed Evaluation reported on A.T.'s cognitive and academic achievement

based on testing conducted in November 2012. *Id.* at 150-153. Although A.T. generally

received average scores, testing indicated that A.T. "may have skills gaps in her knowledge of

applied mathematical concepts." *Id.* at 153. A.T. "scored within the Below Average range on

the Math Problem Solving subtest" and struggled with items "pertaining to probability, fractions,

and geometry." *Id.* She also performed below average in areas assessing her knowledge of

verbal similarities, sequential and quantitative reasoning, and essay composition, but "did not

appear to demonstrate her best effort on this task." *Id.* at 150, 152. Based on A.T.'s

performance on the various assessments and achievement tests, Ms. Class concluded:

> [A.T.'s] cognitive ability is within the Average range. [A.T.'s]
> performance on the achievement assessment[s] suggest Average
> skills, in comparison to her same-aged peers, in basic reading skills,
> reading comprehension, oral reading fluency, written expression,
> and math computation. She scored within the Below Average range
> on the Essay Composition subtest, however she only wrote for six
> of the ten minutes allotted. Additionally, [A.T.] scored within the
> Below Average range on a measure of applied math skills, which
> may be a result of skill gaps from attending multiple schools.

*Id.* at 158.

4

Ms. Class conducted a thirty-minute classroom observation as part of her evaluation and observed that A.T. "appeared drowsy and often placed her head down on the table, despite frequent redirection from her teacher to sit up . . . did not take notes or seem concerned with her performance on the assignment." *Id.* at 148-49, 158. In one-on-one testing, A.T. "displayed a flat affect and again appeared fatigued." *Id.* at 158. Ms. Class concluded that "the results of this evaluation should be interpreted with caution given the likelihood that [A.T.] was experiencing side effects from her medications at the time of testing." *Id.*

The results of the BASC-II, based on the ratings of Ms. Frost and A.T.'s seventh grade teachers, were that A.T. was experiencing at-risk or clinically significant levels of hyperactivity, aggression, conduct problems, anxiety, depression, somatization, internalizing problems, attention problems, school problems, learning problems, atypicality, withdrawal and behavioral symptoms. *Id.* at 153-54. "[A]ll raters reported At-Risk to Clinically Significant levels of Hyperactivity and Aggression." *Id.* at 154-55. Two of A.T.'s seventh grade teachers reported that A.T. "has difficulty keeping up in class, completing tests, and maintaining good grades." *Id.* at 155. Despite these evaluations and observations, A.T.'s seventh grade teachers reported that A.T.'s "emotional/behavioral difficulties have only a mild impact on her educational performance." *Id.*

During the November 2012 MDT meeting, A.T.'s eighth-grade teachers provided classroom observations of A.T. They noted that A.T. was "resilient," "[worked] well with other people, which is a positive change from last year," was "participating in class," and was "pushing herself." *Id.* at 567-68. The Team discussed that A.T. scored in the average range for nearly every subtest in the November 2012 evaluation. *Id.*; *see also id.* at 152-53, 192-93, 536, 540-42. Because the eighth-grade curriculum was built on knowledge learned in the first quarter

of the school year, the Team concluded that A.T. missed learning foundational skills while she was hospitalized at Cumberland and may require remedial tutoring. *Id.* at 567. The Team agreed that A.T. would "be able to catch up and get back on track with relatively little time spent on tutoring." *Id.* at 568. Further, the meeting notes document that "the teachers and [A.T.'s] family did not feel that emotional concerns impact her academic success." *Id.*

The Team unanimously agreed that A.T. was ineligible for special education because its members were "not seeing academic impact." *Id.* at 551, 566-68. The Team discussed A.T.'s eligibility for accommodations under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and decided to review Section 504 eligibility once A.T. had undergone outside psychiatric testing. *Id.* at 568. On November 16, 2012, E.L. Haynes sent a Final Eligibility Determination Report to Ms. Frost, which confirmed the Team's finding that A.T. was ineligible for special education under the IDEA at that time:

> LEA [local educational agency] refuses to identify the student as a student with a disability as defined in IDEA. The LEA does not believe that [A.T.'s] current difficulties are a disability that qualify under IDEA. [A.T.] does struggle with emotional concerns and medical concerns, but thus far, she has been able to be successful in school.

*Id.* at 560.[3] Ms. Frost did not object or disagree.

On March 25, 2013, a team met to determine A.T.'s Section 504 eligibility. *Id.* at 588. That Team consisted of Ariel Van Doren, Family Therapist; Chaun Frost, A.T.'s mother; Cheryl Frost, A.T.'s grandmother; Kandiss Wiggins, Community Support Worker; Veronza Eason; Connie Parham, A.T.'s math teacher; Julie Holt, Inclusion Coordinator; and Teri Johnson-Stokes, School Social Worker. *Id.* at 587. The Section 504 Team concluded that A.T.

---

[3] E.L. Haynes "is public charter school that has elected to be its own local educational agency under the IDEA." Answer [Dkt. 3] ¶ 3.

was eligible for accommodations and adopted a Section 504 plan for A.T.  *Id.* at 579-82, 584-85, 588.

On January 24, 2014, a Section 504 Team meeting was held to review A.T.'s Section 504 plan.  *Id.* at 610-614.  Mia Long, an educational advocate for A.T., asked E.L. Haynes to reconsider A.T.'s eligibility for special education.  *Id.* at 611.  E.L. Haynes did not believe that A.T. needed the support of special education, but proposed to "revisit the need for an [individualized education plan (IEP)] and possibility of an alternative placement" after the completion of a functional behavior assessment (FBA) and psychiatric evaluation.  *Id.*  By letter dated January 27, 2014, Ms. Frost dissented from the outcome of the January 24, 2014 meeting and reiterated her desire that A.T. "be found eligible for an IEP and that she be placed in a full time therapeutic program," presumably at a different school.  *Id.* at 618.

On January 31, 2014, Ms. Frost, on behalf of A.T., filed an administrative due process complaint, complaining that E.L. Haynes failed to provide A.T. with a free appropriate public education (FAPE) at meetings held on November 25, 2012, March 25, 2013 and January 24, 2014 and failed to assess A.T. in all areas of suspected disability.  *Id.* at 5-16.

On March 13, 2014, Ms. Class and Adriana Salcedo, a social worker, completed a functional behavior assessment of A.T.  *Id.* at 659-664.  The functional behavior assessment concluded that A.T. had attended only 32 of 117 instructional days in 2013-2014 of school because she refused to go to school.  *Id.* at 659.

Dr. Todd Christiansen completed a psychiatric evaluation of A.T. on March 13, 2014, which did not include an interview with A.T. because she refused to talk with him.  *Id.* at 666-72, 1114.  Ms. Frost also limited her discussion with Dr. Christiansen to ten minutes.  *Id.* at 834.  Dr. Christiansen concluded that a dysfunctional family dynamic was the reason for A.T.'s

refusal to attend school. *Id.* at 671, 1119. On March 18, 2014, Ms. Frost requested an

independent educational evaluation because she disagreed with Dr. Christiansen's psychiatric

evaluation. *Id.* at 681. E.L. Haynes refused to fund an independent educational evaluation, but

suggested that Dr. Christiansen could interview A.T. and write an addendum to his report. *Id.* at

686. Ms. Frost rejected E.L. Haynes' proposal and refused to let Dr. Christiansen continue his

evaluation of A.T. *Id.* at 685.

Ms. Frost filed a second administrative due process complaint on March 28, 2014,

alleging that E.L. Haynes failed to authorize funding for an independent educational evaluation

to allow a private provider to conduct a psychiatric assessment of A.T. *Id.* at 28, 47. On April 7,

2014, E.L. Haynes answered the second due process complaint and filed a counterclaim

defending Dr. Christiansen's psychiatric evaluation. *Id.* at 40. The two complaints dated

January 31, 2014 and March 28, 2014 were consolidated and a due process hearing was held on

May 16, 2014 and May 19, 2014 before a hearing officer. *Id.* at 101, 827. The Hearing Officer

certified the following three issues for the hearing:

> A. Did Respondent deny the Student a FAPE when it failed to
>    determine that the Student was eligible for services in its
>    meetings dated November 8, 2012, March 25, 2013 and
>    January 24, 2014?
> B. Did Respondent fail to assess the Student in all areas of
>    suspected disability in connection to meetings of November
>    8, 2012, March 25, 2013 and January 24, 2014? If so, did
>    [E.L. Haynes] deny the Student a FAPE?
> C. Did Respondent deny the Student a FAPE when it refused to
>    provide the Student with an I.E.E. after Petitioner's request
>    dated March 18, 2014?

*Id.* at 828. At the due process hearing, Ms. Frost argued that A.T. should be deemed eligible for

special education "because of both the emotional disturbance and the other health impaired

classifications" under IDEA. *Id.* at 836. The Hearing Officer stated that "the parties agree that

the Student meets the criteria for both the above classifications." *Id.* Therefore, the Hearing

Officer established that "[t]he question before this [Independent Hearing Officer] is whether the Student's emotional disturbance and/or other health impairment has an adverse impact on the Student's educational performance, thereby necessitating specialized instruction." *Id.*

The Hearing Officer issued his ruling on May 29, 2014 (AR at 826-48, HOD), finding that E.L. Haynes had denied A.T. a FAPE by failing to determine that she was eligible for special education in November 2012 and by failing to conduct a functional behavior assessment in November 2012. *Id.* at 840, 842. The HOD also found that E.L. Haynes improperly denied A.T. an independent educational evaluation. *Id.* at 843. By way of relief, the Hearing Officer (1) awarded A.T. an independent educational evaluation, (2) ordered E.L. Haynes to reconvene an IEP team to determine A.T.'s program for the 2014-2015 school year after the completion of the independent educational evaluation, (3) directed E.L. Haynes to provide A.T. with a credit recovery program to allow A.T. to gain 6 Carnegie units, and (4) directed E.L. Haynes to provide A.T. with two hours per week of academic tutoring by a certified special education teacher through to the end of the summer of 2014. *Id.* at 846.

On August 26, 2014, E.L. Haynes filed its complaint with this Court, appealing the HOD. *See* Compl. [Dkt. 1]. On October 28, 2014, E.L. Haynes filed a Motion for Partial Stay, seeking to stay the order requiring E.L. Haynes to fund an independent educational evaluation. *See* Mot. for Partial Stay of Admin. Order During Pendency of Appeal [Dkt. 5] at 2.[4] The Court granted the motion in part and ordered E.L. Haynes to pay for an independent educational evaluation for A.T. in an amount not to exceed $800.00 with the proviso that E.L. Haynes' payment obligation was void if A.T. refused to speak one-on-one with the psychiatrist

---

[4] E.L. Haynes reported that it had otherwise complied with the HOD. *Id.*

selected to conduct the independent educational evaluation. *See* Order [Dkt. 11] at 1-2. The

parties have filed cross-motions for summary judgment, which are now ripe for decision.

## II. LEGAL STANDARD

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted

against a party who "after adequate time for discovery and upon motion . . . fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.

When evaluating cross-motions for summary judgment, each motion is reviewed

"separately on its own merits to determine whether [any] of the parties deserves judgment as a

matter of law." *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C.

2012) (citation and internal quotation marks omitted). Neither party is deemed to "concede the

factual assertions of the opposing motion." *Competitive Enter. Inst. Wash. Bureau, Inc. v. Dep't*

*of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006) (citation omitted)). "[T]he court shall grant

summary judgment only if one of the moving parties is entitled to judgment as a matter of law

upon material facts that are not genuinely disputed." *Am. Ins. Ass'n v. United States HUD*, 2014

WL 5802283, at *5 (D.D.C. Nov. 7, 2014) (internal quotation marks and citation omitted). A

genuine issue exists only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### B. The IDEA

The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The Act defines "children with disabilities" as children having one of the specifically delineated conditions, "who, by reason thereof, need special education and related services." *Id.* § 1401(3)(A). Under the IDEA, parents of disabled children have the opportunity to participate in the evaluation and educational placement process of their child. *See id.* § 1415(b)(1). If a parent objects to the identification, evaluation, or educational placement of a disabled child, or whether she is receiving a free appropriate public education (FAPE), *see id.* § 1415(b)(6), the parent may seek an "impartial due process hearing" before an Independent Hearing Officer (here, a D.C. employee), who issues a Hearing Officer Determination (HOD). *Id.* § 1415(f)(1)(A). If the parent is dissatisfied with the determination, she may appeal to a state court or a federal district court. *See id.* § 1415(i)(2)(A).

In cases under the IDEA, a district court "shall review the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). A district court's inquiry has two parts. First, the court must determine whether the school complied with the procedural requirements of IDEA. *See N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 17 (D.D.C. 2008) (citing *Bd. of Educ. of Hendrick Hudson Cent. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982)). Second, the court must

determine whether the eligibility determination was correct under the statute. *See N.G.*, 556 F. Supp. 2d at 30 (citing *Kroot By and Through Kroot v. District of Columbia*, 800 F. Supp. 976, 981 (D.D.C. 1992)).[5]

The burden of proof is on the party challenging the administrative determination, which must "'at least take on the burden of persuading the court that the hearing officer was wrong.'" *Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)). Typically, the court gives "due weight" to the HOD and does not substitute its own view of sound educational policy for that of the hearing officer. *See Rowley*, 458 U.S. at 206. "However, less deference is to be accorded to the hearing officer's decision than would be the case at a conventional administrative proceeding." *Stanton ex rel. K.T. v. D.C.*, 680 F. Supp. 2d 201, 205 (D.D.C. 2010) (citing *Reid*, 401 F.3d at 521). The court "must make an independent determination regarding [a student]'s eligibility while affording some deference to the hearing officer's determination." *Kroot*, 800 F. Supp. at 981. A district court reviews pure questions of law *de novo*. *Reid*, 401 F.3d at 521.

If neither party requests the district court to hear additional evidence, the court may determine the case based on the administrative record on summary judgment. *D.K. v. District of Columbia*, 983 F. Supp. 2d 138, 144 (D.D.C. 2013). Here, neither party has requested that the Court hear additional evidence. The Court finds the record sufficient, and, thus, bases its

---

[5] Under *Rowley*, the second inquiry requires a court to evaluate whether the individualized education program (IEP) developed under IDEA's procedural requirements is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. Because this case involves an ineligibility determination, there is no IEP. "Therefore, the Court must adapt the second step of the *Rowley* inquiry and inquire whether the ineligibility determination was proper under the Act." *N.G. v. Dist. of Columbia*, 556 F. Supp. 2d at 30 (citing *Kroot By and Through Kroot*, 800 F. Supp. at 981).

decision on a review of the administrative record and the briefs and arguments presented by the

parties.[6]

## III. ANALYSIS

The fundamental question raised on appeal is whether the Hearing Officer

Decision (HOD) correctly concluded, as a matter of fact and law, that E.L. Haynes denied A.T. a

free appropriate public education (FAPE) when the school followed all procedural requirements

and the multi-disciplinary team unanimously decided, on November 8, 2012, that A.T. was not

eligible for special education.  E.L. Haynes also disputes the HOD's conclusion that it denied

A.T. a FAPE by not conducting a functional behavior assessment after the November 2012 MDT

meeting and failing to fund an independent educational evaluation for A.T. as requested at the

March 2014 meeting.  The Court finds that the HOD must be affirmed only as to the independent

educational evaluation determination after March 2014 and reversed in all other respects.

As a preliminary matter, Ms. Frost defends her right to challenge the November

2012 MDT decision, despite her contemporaneous agreement, citing *Ridgewood Bd. of*

*Education v. N.E.*, 172 F.3d 238 (3d Cir. 1999).[7]  E.L. Haynes does not disagree.  *See* Pl. Reply

---

[6] The parties do not contest that this Court has original jurisdiction over this matter, and the
District of Columbia is the proper venue.  *See* 20 U.S.C. § 1415(i)(3)(A); 28 U.S.C. § 1331.

[7] Despite Ms. Frost's efforts to distance herself from her agreement with the MDT conclusion
that A.T. was not eligible for special education, the evidence indisputably shows full consensus
by all MDT members with that conclusion.  *See* AR at 551 (Eligibility Determination Report,
initialed by Ms. Frost); *Id.* (Grandmother's assent); *id.* 567-68 (MDT meeting notes); AR at 1050
(MDT meeting members' understanding); AR at 570-71 (post-MDT meeting notice to Ms. Frost,
without objection).  "The team -- including the family -- felt that the Student's behavior rating
scores did not suggest that a need for special education [existed].  Still the team discussed
interventions to address the Student's behaviors . . . ."  *Id.* at 831 (¶ 29).  Ms. Frost now says that
she did not agree with the team's conclusion.  *Id.* at 1009.  *See Rowley*, 458 U.S. at 204 (noting
that the law permits a parent to sue concerning "any matter relating to the identification,
evaluation, or educational placement of the child, or the provision of a free appropriate public
education to such child." (citing 20 U.S.C. § 1415(b)(1)(E)).

[Dkt. 16] at 5 ("E.L. Haynes has never disputed that [Ms. Frost] retained a legal right to challenge the eligibility determination . . . [but] [s]he does not have any right to exclude the *meaning* of that reversal from this case."). The Court agrees that Ms. Frost can challenge the November 2012 MDT decision despite her agreement with the multi-disciplinary team on November 8, 2012.

### A. Procedural Compliance with the IDEA

Ms. Frost did not, and does not, complain that E.L. Haynes failed to comply with any procedural requirements of the IDEA surrounding or at the multi-disciplinary team meeting on November 8, 2012.

E.L. Haynes argues that the HOD should have addressed its full compliance with the procedural requirements of the IDEA. It cites *Board of Education of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982), for the proposition that the procedural safeguards of the IDEA, along with the "full participation of concerned parties throughout the development of the [Individual Education Plan] . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Id.* 458 U.S. at 206. Although *Rowley* was interpreting the Education for All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.* (1976 ed. and Supp. IV), that statute was a precursor to the current law and *Rowley*'s directions remain good law.[8] Because this point is emphasized by E.L. Haynes, it is worth quoting *Rowley* at some length:

---

[8] In 1990, the United States Congress reauthorized the Education for All Handicapped Children Act and changed the name to Individuals with Disabilities Education Act, which in turn was amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 302, 118 Stat. 2647, 2803 (2004). The amendments establish that the short title of the reauthorized and amended provisions remains the Individuals with Disabilities Education Act.

When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, *see, e.g.,* §§ 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard. . . .

. . .

Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 205-07.

Where a party challenges an ineligibility determination, there is no IEP; consequently, the inquiry becomes "whether the ineligibility determination was proper under the [IDEA]." *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 30 (D.D.C. 2008) (citing *Kroot v. District of Columbia*, 800 F. Supp. 976, 981 (D.D.C. 1992)). In this inquiry, the education professionals' opinions carry significant weight. *Rowley*, 458 U.S. at 207 ("*The primary responsibility for formulating the education* to be accorded a handicapped child, and *for choosing the educational method most suited to the child's needs, was left by the [IDEA] to state and local agencies* in cooperation with the parents or guardian of the child.") (emphasis added);

---

*See* Pub. L. No. 108–446, § 101; 118 Stat. at 2647; 20 U.S.C. § 1400 (2006) ("This chapter may be cited as the 'Individuals with Disabilities Education Act'"). The Court will refer to the amended Act herein as the IDEA.

*id.*, at 208 ("[O]nce a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the State.").

For sure, *Rowley* was giving directions to the district courts that hear appeals from HODs and not addressing how a Hearing Officer is to decide. However, the failure of the instant HOD to address E.L. Haynes' procedural compliance means that it failed to consider the importance of that factor—including the active participation of both Ms. Frost and A.T.'s grandmother and the agreement of both at the November 2012 MDT meeting. While a parent's agreement does not bar a later challenge to the decision of an MDT meeting, it nonetheless figures into evaluating a school's compliance with the IDEA. Inasmuch as Congress gave the procedural protections in the IDEA "every bit as much emphasis . . . as it did upon measurement of the resulting" decisions, reviewing courts must do so. *Rowley*, 458 U.S. at 205.

The HOD gives short shrift to procedural compliance. It *mentioned* the full cast at the MDT meeting but did not analyze the significance of that fact. It *mentioned* that A.T.'s mother and grandmother participated and agreed with the November 2012 MDT decision, but accepted Ms. Frost's later testimony, which said she silently disagreed but did not understand she could say so, without considering the implications (and timing) of both. AR 1009. It *mentioned* that the MDT decision was unanimous but did not address the significance of that fact. While it would have been helpful if the HOD addressed procedural compliance directly, in fact, it appears the procedures were satisfied.

### B.  Substantive Compliance with IDEA

E.L. Haynes stresses that Ms. Frost's agreement that A.T. was ineligible for special education services in November 2012 "produced a unanimous eligibility determination, strongly suggesting it was . . . substantively appropriate." *Id.* Further, E.L. Haynes argues that

Ms. Frost's credibility was "seriously impeached by her subsequent testimony that conflicted with her original, written agreement with the eligibility determination." *Id.* Neither point was evaluated by the HOD.

The Court agrees with Ms. Frost that procedural compliance alone does not satisfy IDEA. Substantive compliance with the law is equally important, *see Rowley*, 458 U.S. at 207, even if the substantive standards are less clearly stated in the statute. E.L. Haynes does not actually take a contrary position. Its argument is somewhat more nuanced: "a unanimous IEP team decision does not *necessarily* inoculate it from any further administrative or judicial review, but it certainly suggests that it was correct *at the time it was made*. . . . [A] unanimous IEP team decision indicates substantive appropriateness." Pl. Reply at 6. In essence, E.L. Haynes argues that there should be a presumption of substantive appropriateness when all procedural requirements are fulfilled and a multi-disciplinary team reaches a unanimous decision. *See id.* at 13 n.5 ("EL [sic] Haynes still maintains that it was an outrageous overstep of authority for the Hearing Officer to disturb a unanimous IEP decision that was procedurally compliant in every way.").

At least without more strenuous briefing (beyond Ms. Frost), the Court is unwilling to adopt a presumption as a matter of law that full compliance with IDEA procedures and MDT unanimity will result in substantive compliance with the IDEA. *Rowley* expressly contemplates a two-part inquiry. *See Rowey*, 458 U.S. at 206-07. Therefore, the Court must proceed and determine whether the eligibility determination was proper. *See N.G.*, 556 F. Supp. 2d at 30.

Before this Court, the parties argue extensively over whether A.T.'s disability adversely affected her educational performance, leading the Court to conclude that the HOD

erred as a matter of fact and law when it stated that the parties agreed that A.T. had an

"emotional disturbance" and "other health impairment" as defined by the statutory criteria. *See*

AR at 836. To the contrary, "emotional Disturbance" is defined as

> a condition exhibiting one or more of the following characteristics
> over a long period of time and to a marked degree *that adversely
> affects a child's educational performance*:
> (A) An inability to learn that cannot be explained by intellectual,
> sensory, or health factors.
> (B) An inability to build or maintain satisfactory interpersonal
> relationships with peers and teachers.
> (C) Inappropriate types of behavior or feelings under normal
> circumstances.
> (D) A general pervasive mood of unhappiness or depression.
> (E) A tendency to develop physical symptoms or fears associated
> with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i) (emphasis added). "Other health impairment" is defined as

> having limited strength, vitality or alertness . . . that results in limited
> alertness with respect to the educational environment, that-
> (i) Is due to chronic or acute health problems such as . . . attention
> deficient disorder or attention deficit hyperactivity disorder,
> diabetes, . . .; and
> (ii) *Adversely affects a child's educational performance*.

*Id.* § 300.8(c)(9) (emphasis added). Obviously, one *component* of the definition of "emotional

disturbance" and "other health impairment" is whether that condition "adversely affects a child's

educational performance." *Id.* §§ 300.8(c)(4)(i), 300.8(c)(9). Determining that a child has an

"emotional disturbance" or "other health impairment" only fulfills the first prong of the analysis

under 20 U.S.C. § 1401(3)(A) as to whether she is a "child with a disability." Under the IDEA,

> The term "child with a disability" means a child—
> (i) with . . . serious emotional disturbance (referred to in this chapter
> as "emotional disturbance"), . . . or specific learning disabilities; *and*
> (ii) *who, by reason thereof, needs special education and related
> services.*

20 U.S.C. § 1401(3)(A) (emphasis added); *see also* 34 C.F.R. § 300.8(a)(1)("Child with a

disability means a child evaluated . . . as having . . . a serious emotional disturbance (referred to

in this past as 'emotional disturbance'), . . . an other health impairment, *and, who, by reason thereof, needs special education and related services*.") (emphasis added).  To be eligible for special education as of November 2012, A.T. must have *needed* special education and related services because of her disability.  *See Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 383 (5th Cir. 2007).

The HOD identified the key issue as whether A.T.'s "emotional disturbance and/or other health impairment *has* an adverse impact on the Student's educational performance, thereby necessitating specialized instruction." AR at 836 (emphasis added).  The use of the present tense in 2014 is telling because the HOD conflated past (as of November 2012) and subsequent events.  E.L. Haynes, however, argues that five criteria must be met before a child is eligible for special education under the IDEA:

> The child must (1) have an enumerated disability, 34 CFR § 300.8; (2) that *does*, rather than can, adversely impact the child's educational performance, § 300.8(c)(4)(i); (3) which is not caused by a lack of appropriate instruction in math, § 300.306(b)(1); (4) and the student must need special education, § 300.8(a)(1); (5) which goes beyond just related services, § 300.8(a)(2)(i).   Accord 20 U.S.C. §§ 1401(3), 1414(b).

Pl. Mot. [Dkt. 12] at 10.  E.L. Haynes argues that the HOD must be reversed because it failed to examine each of these criteria.  *Id.*  Ms. Frost does not contest the relevance of the five criteria to the case at hand, but argues that the Hearing Officer correctly applied the legal standard and E.L. Haynes is merely "nitpick[ing] the precise phrasing of the Hearing Officer's analysis." Def. Cross-Mot [Dkt. 13] at 12-13.

Before this Court, the parties first argue over the meaning of "educational performance." E.L. Haynes argues that "an adverse impact on a child's 'educational performance' requires at least an 'adverse impact on *academic performance*.'" Pl. Mot. at 11 (emphasis added) (citing *Maus v. Wappingers Cent. Sch. Dist.*, 688 F. Supp. 2d 282, 294 (S.D.N.Y.

2010); *C.B. ex rel. Z.G. v. Dep't of Educ. of the City of N.Y.*, 322 F. App'x 20, 21-22 (2d Cir. 2009);

*A.J. v. Bd. of Educ., East Islip Union Free Sch. Dist.*, 679 F. Supp. 2d 299, 310-11 (E.D.N.Y. 2010)).

Further, E.L. Haynes cites cases that have required an adverse effect on academic performance to

find that a child's behavioral issues make her eligible for special education. *See, e.g., Alvin*

*Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 384 (5th Cir. 2007); *Q.W. ex rel. M.W.*

*v. Board of Education of Fayette County, Kentucky*, No. 14-126, 64 IDELR 308, at *7 (E.D. Ky.

Jan. 14, 2015); *Ashli C. ex rel. Sidney C. v. State of Hawaii*, No. 5-429, 47 IDELR 65 (D. Haw.

Jan. 23, 2007).

   Ms. Frost attacks E.L. Haynes' argument that the term "educational performance"

relates "solely to include academic performance" based on E.L. Haynes' citation to cases from

the Second Circuit, which are not controlling.  In contrast, she contends that "educational

performance" must be construed more broadly.[9]  Ms. Frost notes guidance from the D.C. Office

of Special Education Programs that "[i]t remains the department's position that the term

'educational performance' used in the IDEA and its implementing regulations is not limited to

academic performance." *Id.* at 14 (citing *Letter to Clark*, 48 IDELR 77 (2007)).  She also relies

on the fundamental purpose of IDEA to "ensure that *all* children with disabilities have available

to them a free appropriate public education . . . designed to meet their unique needs and prepare

them for further education, employment, and independent living." *Id.* at 15 (citing 20 U.S.C.

1400(d)(1)(a) (emphasis added)).  Further, she finds support in Congress's recognition that

"social and emotional problems are not *ipso facto* separable from the learning process." *Id.*

(citing *Independent School District No. 284 v. A.C.*, 258 F.3d 769, 777 (8th Cir. 2001) (citing

---

[9] Ms. Frost does not deny that academic performance is relevant to A.T.'s "educational
performance."

*Honig v. Doe*, 484 U.S. 305, 320 (1988)).  In view of a broader reading of "educational performance," Ms. Frost claims that A.T.'s "poor behavior and, *later*, truancy constitute educational impact," Def. Cross-Mot. at 15 (emphasis added),[10] and that "A.T.'s disability caused an educational impact by causing the at-risk or clinically significant levels of hyperactivity or aggression, as well as inattention, school and learning problems, which were found by the Hearing Officer," Def. Reply [Dkt. 18] at 12.

E.L. Haynes has the better part of the argument.  The Court again takes its cue from *Rowley*, in which the Supreme Court emphasized that "if the child is being educated in the regular classrooms of the public education system, [an IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204.  While advancement from grade to grade is not always dispositive, *Rowley* found that the student's "academic progress, when considered with the special services and professional consideration accorded by the . . . school administrators, to be dispositive." *Id.* at 203 n. 25. While *Rowley* dealt with the standard for special education services provided to an eligible student and this case concerns an MDT decision on eligibility, *Rowley* suggests that academic progress should be the *primary focus* in this Court's evaluation of whether A.T.'s disability had an adverse impact on her "educational performance" as of November 8, 2012. *See Rowley*, 458 U.S. at 201 (IDEA was adopted to provide a "basic floor of opportunity"); *Q.W. ex rel. M.W.*, 64 IDELR 308 ("And taken at face value, the term 'educational performance' suggests school-based

---

[10] Ms. Frost chides E.L. Haynes for making "irrelevant arguments on its flawed assumption that truancy is somehow the basis for Ms. Frost's claims," despite having raised the issue herself. Def. Reply. at 18.  It is plain that A.T.'s truancy that post-dates the November 2012 MDT meeting is not relevant to the Team's decision.  Truancy was also an issue mentioned in the HOD.  *See* AR at 832 ("Attendance issues and failing to turn in assignments affected the Student's academic performance during the 2012-2013 school year."), 833, 839 ("The Section 504 plan also indicates that the Student's impairment requires an attendance plan.").

evaluation."). Indeed, there is no doubt that many students need special education because they are not capable of learning solely in a mainstream school setting. However, most students who are able to succeed academically in such an environment do not need special education. *See Ashli C. ex rel. Sidney C.*, 47 IDELR 65 ("If a student is able to learn and perform in the regular classroom taking into account his particular learning style without specially designed instruction, the fact that his health impairment may have a minimal adverse effect does not render him eligible for special education services."). In the end, each eligibility determination must be made "on a case-by-case basis, depending on the unique needs of a particular child." *Letter to Clark, 48 IDELR 77* (Mar. 8, 2007).

The HOD fails to include any discussion of A.T.'s academic progress. Instead, the HOD emphasized A.T.'s conduct and school issues in the 2011-2012 school year (7th grade) and the evaluations of her seventh grade teachers "*about the Student's 2011-2012 school year.*" as reflected through BASC-II testing in October 2012 (although she was then in 8th grade). AR at 837 (emphasis added). The HOD noted that in the spring of 2012, during the seventh grade, "the Student began to display manifestations of sundry physical illnesses . . . , suggesting to this [Independent Hearing Officer] that her emotional issues were worsening." *Id.* It also relied on the fact that during a thirty-minute observation of A.T. in class in October 2012 (8th grade), she was "noncompliant with instructions, she was falling asleep in class, she did not take notes as requested, and she did not show concern about the assignment." *Id.* Although ostensibly crediting all witnesses, *id.* at 835 (¶ 51), the HOD discredited testimony "that a change in medication and the positive experience at a treatment facility had reduced the Student[']s behavioral issues so that they would not adversely impact the Student." *Id.* at 837-38. It failed to consider Ms. Frost's corroborating statement in the November 2012 MDT meeting that

medications may have interacted with A.T.'s sleep and her recognition that A.T.'s bedtime routine needed improvement. *Id.* at 567.

The HOD was critical that A.T.'s "eighth grade teachers were not called as witnesses to explain how it was that the Student's emotional issues had then subsided." *Id.* at 838. And yet it ignored uncontested statements from A.T.'s eighth grade teachers, recorded in the November 2012 MDT meeting notes, that A.T. was "resilient," "[worked] well with other people, which is a positive change from last year," was "participating in class," and was "pushing herself." *Id.* at 567. In addition, the HOD completely ignored A.T.'s four months at Cumberland and the positive report on her improved ability to control her angry outbursts.

In essence, the HOD relied on selected pieces of evidence to support its conclusion that "it would have been appropriate to classify the Student as eligible for services as a Student with multiple disabilities at the time of the November, 2012 meeting." *Id.* at 838. This finding stands on faulty legs because the HOD never considered whether A.T.'s health conditions affected her education in November 2012 or whether any disability caused A.T., in November 2012, to *need* special education. *See* 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(a)(1). Moreover, the HOD concluded that a "change in the delivery of instruction to the Student was appropriate for the Student in November, 2012," *id.* at 839-40, without considering whether A.T. needed a related service and not special education. *See* 34 C.F.R. § 300.8(a)(2)(i) ("[I]f it is determined, through an appropriate evaluation . . . that a child has one of the disabilities identified in paragraph (a)(1) of this section, but only needs a related service and not special education, the child is not a child with a disability under this part."). Finally, the HOD failed to consider whether lack of instruction in math accounted for A.T.'s below average scores in that discipline. *See* 34 C.F.R. § 300.306(b)(1) ("A child must not be determined to be a child

with a disability under this part— (1) If the determinant factor for that determination is—(ii) Lack of appropriate instruction in math.").[11] Contrary to Ms. Frost's assertion, the HOD failed to analyze the proper legal standards in concluding that E.L. Haynes had denied A.T. a FAPE in November 2012 and must be reversed on this issue.

Properly analyzed as of November 2012 without later events or hindsight, the full record supports the November 2012 MDT decision that A.T. was ineligible for special education at that time. The record is clear that A.T. generally scored in the average range on the achievement assessment tests that were considered at the November 2012 MDT meeting. *See* AR at 158. She worked on an 8th grade curriculum at ███████ nd there is no evidence that she struggled with her schoolwork there. *See* AR 136-37. To the contrary, ███████ reported that A.T. "worked well on academic assignments and enjoyed participating on special projects" and even "enjoyed working on challenging word puzzles when her coursework was completed." *Id.* at 136. A.D.'s passing grades and generally average assessment scores demonstrate that A.T. was making academic progress as of that time. *See Rowley*, 458 U.S. at 207 n.28 ("[T]he achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit."). The only area of academic concern was applied mathematical concepts. *See* AR at 158. Although she scored in the below-average range on her essay composition subtest, Ms. Class cautioned that A.T. "only wrote for six of the ten minutes allotted." *Id.* And A.T.'s scores in the below-average range on certain applied math subtests "may be a result of skill gaps from attending multiple schools." *Id.* A.T.'s stay at ███████ overlapped with the beginning of the 2012-2013 school year and caused her to miss forty-three

---

[11] Indeed, the MDT team identified "lack of appropriate instruction in math – missed instruction due to hospitalization" as a reason for concluding that A.T. was not eligible for special education. AR at 563.

days of school before she returned in October 2012. AR at 774-78, 1069. The Court credits the logical observation by one of A.T.'s eighth grade teachers that "the current curriculum in 8th grade is strictly built on knowledge that was learned in the first quarter, which aligns with the difficulty that [A.T.] is currently having." *Id.* at 567-68.

The Court places less weight on the observations of A.T.'s former seventh grade teachers, particularly because they do not account for the treatment and therapy A.T. received at ███████████ Even though ███████████'s prognosis for A.T. was "guarded" because she was returning home, A.T. made distinct progress on managing her behavioral and emotional issues during her four-month stay at ███████. *See* AR at 134-35, 137-39. Additionally, A.T.'s eighth grade teachers reported appropriate classroom behavior. The weight of the evidence leads this Court to conclude that, as of November 2012, A.T.'s emotional and behavioral problems were not interfering with her classroom education. For the foregoing reasons, the Court finds that the HOD erred in its determination that E.L. Haynes denied A.T. a FAPE by failing to deem her eligible for services on November 8, 2012. The Court finds that A.T. was not eligible for special education under the IDEA as of November 2012. Accordingly, the Court also finds that the HOD erred in awarding A.T. compensatory education.

### C. E.L. Haynes Had No Obligation to Provide A.T. with a Functional Behavior Assessment in November 2012

Upon request for an initial evaluation to determine whether a child is a "child with a disability" under the IDEA, an LEA must conduct an initial evaluation of the child using "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining—(i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program." 20 U.S.C. § 1414(b)(2)(A). An LEA is obligated to assess a

child "in all areas of suspected disability." *Id.* § 1414(b)(3)(B). The HOD concluded that E.L. Haynes failed to assess A.T. in all areas of suspected disability by failing to conduct a functional behavior assessment of A.T. in connection with the November 2012 MDT meeting. AR at 842. Because the HOD relied on an error of law, its conclusion must be reversed.

The HOD erroneously asserted that "[c]ourts in the District of Columbia have held that it is 'essential' for the LEA to develop [a functional behavior assessment]" and that "the failure to write up [a functional behavior assessment] should be deemed a procedural violation." AR at 840-41 (relying on *Harris v. Dist. Of Columbia*, 561 F. Supp. 2d 63, 68 (D.D.C. 2008)). *Harris* did not hold that an LEA is obligated to conduct a functional behavior assessment in order to assess a child in all areas of suspected disability. Rather, *Harris* addressed the situation where a child had already been deemed eligible for services under the IDEA. *Harris*, 561 F. Supp.2d at 64, 67. In *that context*, the Court noted that a functional behavior assessment "plays an integral role *in the development of an IEP*" for a child with behavioral difficulties and emphasized that "the information gleaned from the assessment is central to *formulating an IEP* tailored to the needs of individual disabled children." *Id.* at 68 (emphasis added). *Harris* is not applicable here: the November 2012 MDT meeting was held for the purposing of determining A.T.'s *eligibility* for special education, and, having answered that question in the negative, never proceeded to developing an IEP.

Ms. Frost overreaches when she argues that "behavioral concerns constitute an area of suspected disability in which the Plaintiff was obligated to conduct an evaluation, specifically [a functional behavior assessment], as part of the evaluation process." Def. Cross-Mot. at 27. "Behavioral concerns" are not one of the enumerated disabilities identified in the IDEA. *See* 20 U.S.C. § 1401(3) ("The term 'child with a disability' means a child . . . with

intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities."). Furthermore, the IDEA itself does not mandate a functional behavior assessment —or any other particular evaluation— as part of the evaluation process. Rather, an LEA must use "a variety of assessment tools and strategies." 20 U.S.C. § 1414(b)(2)(A). Here, there is no question that E.L. Haynes used a range of assessment procedures to evaluate A.T. and in fact considered A.T.'s behavioral issues by conducting the Behavior Assessment System for Children, Second Edition (BASC-II), all of which were discussed at the MDT meeting. *See* AR at 147 (Psych/Ed Evaluation noting that assessment of A.T. included a classroom observation; student interview; phone interview with A.T.'s case manager; Differential Ability Scales, 2nd Edition; Wechsler Individual Achievement Test, 3rd Edition; BASC-II, which included a self-report, teaching rating scales, and parent rating scales; and an Emotional Disturbance Decision Tree, which included a Parent Rating Scale and Teacher Rating Scale). With the benefit of hindsight, Ms. Frost may have preferred that E.L. Haynes also administer a functional behavior assessment in November 2012, but she did not ask for an assessment then and the law does not require it. *See Long v. District of Columbia*, 780 F. Supp. 2d 49, 60 ("The IDEA does not require LEAs to administer every test requested by a parent or educational advocate. Rather, to ensure that a child with a disability receives a FAPE, an LEA must use 'a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information.'") (citing 20 U.S.C. § 1414(b)(2)(A)). The Court concludes that E.L. Haynes properly assessed A.T. in all areas of suspected disability and was not obligated to administer a functional behavior assessment in connection with the November

2012 eligibility meeting.  For these reasons, the Court will reverse the HOD's erroneous

determination regarding the functional behavior assessment.

### D.   E.L. Haynes Was Obligated to Provide A.T. an Independent Educational Evaluation in 2014

Following Mia Long's January 2014 request that E.L. Haynes reconsider A.T.'s

eligibility for special education, Dr. Todd Christiansen completed a psychiatric evaluation of

A.T. in March 2014.  *Id.* at 666-72.[12]  Because she disagreed with Dr. Christiansen's report, Ms.

Frost subsequently requested an independent educational evaluation at public expense.  E.L.

Haynes did not consent to funding an independent educational evaluation.  Ms. Frost is entitled

to an independent educational evaluation at public expense if she disagrees with the evaluation

obtained by the school, unless E.L. Haynes can show that its evaluation was appropriate.  34

C.F.R. § 300.502(b).  The HOD determined that Dr. Christiansen's conclusions were

"speculative" because he was unable to interview A.T. and only briefly interviewed Ms. Frost.

AR at 843.  The HOD relied on Dr. Christiansen's testimony that "the assessment was not

complete because there was insufficient exploration of the Student's school refusal issues in the

report" and "the report could have been more effective were [Ms. Frost] and [A.T.] meaningfully

interviewed."  *Id.*  The HOD concluded that an independent educational evaluation was

"warranted to get to the root of the school refusal and to allow for interviews of [A.T.] and [Ms.

Frost]."  *Id.*  Because the HOD was correct, the Court will uphold its award of an independent

educational evaluation to Ms. Frost.

---

[12] Dr. Christiansen is not an employee of E.L. Haynes, had never previously worked for the
school, and testified that compensation for his evaluation was not conditioned on any particular
outcome.  AR at 1134.

E.L. Haynes faults the HOD for failing to analyze whether Dr. Christiansen's evaluation met IDEA standards, but cites to the provision requiring local educational agencies to "use a variety of assessment tools and strategies" in the determination of a child's eligibility for special education services and the content of the child's IEP. *See* 20 U.S.C. § 1414(b); 34 C.F.R. § 300.304. These provisions do not establish the standards for any particular evaluation or assessment tool and therefore the HOD did not err by failing to compare Dr. Christiansen's evaluation against them. E.L. Haynes also suggests that "an evaluation must be deemed appropriate where the 'methodology' was appropriate." Pl. Mot. at 27 (citing *L.S. ex rel. K.S. v. Abington Sch. Dist.*, No. 06-5172, 2007 WL 2851268, at *11-12 (E.D. Pa. Sept. 30, 2007)).

Although the HOD did not express itself in these exact words, it is evident that the HOD found the psychiatric evaluation insufficient as a matter of methodology: A.T. was not interviewed. The HOD cited Dr. Christiansen's testimony regarding the centrality of such an interview to a complete assessment and investigation of A.T.'s school refusal issues. *See* AR at 834, 843. Although E.L. Haynes vigorously defends Dr. Christiansen's psychiatric evaluation of A.T., *see* Pl. Mot. at 26-31; Pl. Reply at 21-23, it cannot overcome the obvious and fatal deficiency of the evaluation: there was no interview with A.T.[13] This conclusion is buttressed by Dr. Christiansen's own testimony that an interview with the subject "is one of the main components of an evaluation." AR at 1141.[14] The Court concludes that the HOD correctly determined that Dr. Christiansen's evaluation was inappropriate, thus obligating E.L. Haynes to

---

[13] Admittedly, A.T. is responsible for this outcome, not Dr. Christiansen, but the lack of an interview precluded concluding his report.

[14] Dr. Christiansen also testified that it would have been his goal to return to the home to supplement his initial report, but that he was requested to "provide a quick turnaround on the report." AR at 1141.

fund an independent educational evaluation. Because the Court earlier denied in part E.L.

Haynes' motion for a partial stay of the HOD during pendency of its appeal and ordered E.L.

Haynes to "pay for an independent psychiatric [sic] evaluation (IEE) for A.T. in an amount not to

exceed $800.00," the Court will now order E.L. Haynes to pay the balance of the cost, if any, of

the independent educational evaluation that was conducted subsequent to the Court's January 15,

2015 Order.

## IV.  CONCLUSION

For the reasons above, the Court will grant in part and deny in part E.L. Haynes'

motion for summary judgment and will grant in part and deny in part Ms. Frost's cross-motion

for summary judgment. The HOD will be affirmed with respect to A.T.'s entitlement to an

independent educational evaluation as of March 2014 and will be reversed in all other respects.

Judgment will be entered in favor of Ms. Frost with respect to the independent educational

evaluation, and judgment will be entered in favor of E.L. Haynes in all other respects. E.L.

Haynes will be ordered to pay the balance of the cost, if any, of the independent educational

evaluation that was conducted subsequent to the Court's January 15, 2015 Order. A

memorializing Order accompanies this Opinion.


Date: September 11, 2015


                                        /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge